873 So.2d 270 (2004)
J.B. PARKER, Appellant,
v.
STATE of Florida, Appellee.
No. SC01-172.
Supreme Court of Florida.
January 22, 2004.
Rehearing Denied April 28, 2004.
*275 David M. Lamos, Fort Pierce, FL, for Appellant.
Charles J. Crist, Jr., Attorney General, and Melanie Ann Dale, Assistant Attorney General, West Palm Beach, FL, for Appellee.
PER CURIAM.
J.B. Parker appeals a death sentence imposed following a new penalty phase after his previous death sentence was vacated because the State failed to produce exculpatory evidence.[1] We previously affirmed Parker's convictions for kidnapping, robbery with a firearm, and first-degree murder. For the reasons that follow, we affirm Parker's death sentence.

FACTS AND PROCEDURAL HISTORY
In 1982, Parker and three other defendants, John Earl Bush, Alphonso Cave, and Terry Wayne Johnson, robbed a convenience store. The facts are set forth in detail in our opinion on Parker's first direct appeal. See Parker v. State, 476 So.2d 134, 135 (Fla.1985). We summarized the facts in our most recent opinion in this case as follows:
Money was taken from the store and the female store clerk [Frances Slater] was also taken from the store and placed in Bush's car. The victim was later found dead; she had been shot and stabbed. Death was caused by a gunshot wound to the back of the head. Bush's girlfriend testified that Parker had admitted to her that he shot the victim and that Bush had stabbed her. The girlfriend's mother and sister testified that she told them of Parker's confession. Parker's pre-trial statements to police regarding the crime were also introduced and Parker also testified at trial. In those statements, he implicated himself in the crimes but denied being the shooter.
State v. Parker, 721 So.2d 1147, 1148 (Fla. 1998).
In 1998, Parker was granted a new penalty phase due to the discovery of favorable evidence withheld by the State in violation of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). See Parker, 721 So.2d at 1149. During the new penalty phase, the State presented witnesses to establish the facts of the original crime and Parker's culpability, including codefendant Johnson, who recounted the events leading to Slater's murder.
Johnson testified that the first time the defendants went to the convenience store, all four went in to buy potato chips and that when they returned to the store later that evening, Parker went into the store with Cave and Bush to commit the robbery. Johnson also testified that when they arrived at the location where Slater was killed, Parker took the gun from Cave. Johnson stated that he heard a shot but did not know who shot Slater, that after the murder Parker told Bush to get rid of the knife, and that the four later split the money taken from the store.
The State also introduced a statement made by Parker on May 7, 1982, when he went with Detective David Powers to the area where the victim was killed. During this time, Parker stated that Bush both stabbed and shot the victim, indicated where Bush had thrown the knife after the murder, and recounted that the four defendants discussed killing a sheriff's deputy, Timothy Bargo, who stopped the car in which they were riding on the night of the murder.
Parker presented several witnesses in mitigation. Of significance for the purposes *276 of Parker's appeal is the testimony of Richard Barlow, who was the prosecutor during Cave's 1993 penalty phase. Barlow stated that he relied on the testimony of Michael Bryant, who was in the same cell as Cave at the Martin County jail, to establish that Cave was a principal in Slater's murder. Barlow testified that Bryant went to Arthur Jackson, who was running the jail at the time, and told Jackson that he overheard a conversation between Cave and Bush, in which Cave admitted that he "popped a cap" in the back of Slater's head.
In addition, portions of Michael Bryant's testimony given during Cave's 1993 penalty phase were read into the record. Bryant testified about the conversation he overheard between Cave and Bush:
Well what I overheard, Bush was a couple of cells down and what it was, you know, they started talking about it and Bush told Cave, says, we wouldn't never be in here if you didn't try to burn her with a cigarette butt. He says, well, you stabbed her in the stomach and Bush told Cave, he says, well, you popped a cap in the back of her head.
The jury returned a verdict recommending a sentence of death for Parker by a vote of eleven to one. The trial court found five aggravating factors: (1) the capital felony was committed while the defendant was engaged in the commission of a kidnapping; (2) the capital felony was committed for the purpose of avoiding or preventing a lawful arrest; (3) the capital felony was committed for pecuniary gain; (4) the capital felony was especially heinous, atrocious, or cruel ("HAC"); and (5) the capital felony was committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification ("CCP"). The trial court found one statutory mitigator,[2] that the defendant was nineteen years of age at the time of the crime (very little weight), and found thirteen nonstatutory mitigators, giving all but two little or very little weight.[3] The trial court rejected the nonstatutory mitigator *277 that Parker was not the actual triggerman. Finding that the aggravating circumstances outweighed the mitigating circumstances, the trial court agreed with the jury's recommendation and imposed the death penalty. On appeal Parker raises numerous issues, each of which we address below.[4]

I. MOTION TO SUPPRESS
Prior to his initial trial, Parker filed a broad motion to suppress seeking to exclude "all written and oral statements made by the Defendant to police authorities or other agents of the State of Florida." After an evidentiary hearing, the trial court denied the motion.
On direct appeal to this Court, Parker argued that the trial court erred in denying his motion to suppress. Specifically, Parker asserted that a taped statement given to police on May 5, 1982, was taken in violation of his Fifth Amendment right to remain silent until he was able to speak with an attorney. We concluded that the trial court did not err in denying the motion to suppress. See Parker, 476 So.2d at 137-38. On appeal from the denial of his federal habeas petition, the Eleventh Circuit Court of Appeals concluded that the May 5 statement was taken in violation of Parker's Fifth Amendment right to counsel. See Parker v. Singletary, 974 F.2d 1562, 1574 (11th Cir.1992). However, the Eleventh Circuit held that the admission of this statement was harmless error as to both the guilt and penalty phases. Id. at 1576-77.
Prior to the penalty phase at issue in this appeal, Parker filed another motion to suppress, focusing primarily on his May 7 statement to Detective Powers. Parker argued that the May 7 statement resulted directly from the May 5 statement found to be inadmissible by the Eleventh Circuit, see id. at 1574, and that because the police initiated the May 7 interview, the United States Supreme Court's decision in Michigan v. Jackson, 475 U.S. 625, 106 S.Ct. 1404, 89 L.Ed.2d 631 (1986), decided after Parker's original trial, required suppression of the May 7 statement.[5] The State did not challenge the Eleventh Circuit's ruling that the May 5 statement was taken in violation of Parker's Fifth Amendment *278 right to counsel and did not seek to introduce this statement during the new penalty phase. However, the State filed a motion to quash Parker's motion to suppress, asserting that Parker was barred from raising the issue of the admissibility of the May 7 statement because he had previously filed a motion to suppress this statement and had not pursued the issue on appeal. The trial court granted the motion to quash and never reached the merits of Parker's motion to suppress his May 7 statement.
After oral argument in this appeal, we relinquished jurisdiction to the trial court with directions to conduct an evidentiary hearing on the motion to suppress and thereafter to issue an order on the merits of the motion. We reached the conclusion that the trial court should have considered the merits of the motion to suppress, for two related reasons. First, because this was a new penalty phase, the "clean slate" principle discussed in Preston v. State, 607 So.2d 404, 408-09 (Fla.1992), applied. Second, and contrary to the State's assertion, because the admissibility of Parker's May 7 statement had never been litigated and decided in any prior appeals, Parker was not barred from litigating this issue under either the doctrine of law of the case or res judicata.
We recently clarified the scope of both res judicata and law of the case, stating:
[T]he doctrines of the law of the case and res judicata differ in two important ways. First, law of the case applies only to proceedings within the same case, while res judicata applies to proceedings in different cases. Second, the law of the case doctrine is narrower in application in that it bars consideration only of those legal issues that were actually considered and decided in a former appeal, while res judicata bars relitigation in a subsequent case or action not only of claims raised, but also claims that could have been raised.

Florida Dep't of Transp. v. Juliano, 801 So.2d 101, 107 (Fla.2001) (emphasis supplied) (citations omitted). Clearly, law of the case does not apply to Parker's claim in that, as the State admits, the issue of the admissibility of the May 7 statement was never actually considered and decided by this Court in Parker's first appeal. Further, even if law of the case applied, "[t]his Court has the power to reconsider and correct erroneous rulings in exceptional circumstances and where reliance on the previous decision would result in manifest injustice." State v. Owen, 696 So.2d 715, 720 (Fla.1997).
As to res judicata, the key question is whether this penalty phase is a new and different case. We conclude that it is not. Cf. Juliano, 801 So.2d at 105 ("Where successive appeals are taken in the same case there is no question of res judicata, because the same suit, and not a new and different one, is involved."). Although a new penalty phase is a "completely new proceeding," Lucas v. State, 841 So.2d 380, 387 (Fla.2003), the guilt and penalty phases of a capital trial are parts of the same case and the death sentence imposed after Parker's new penalty phase is not final until affirmed by this Court on direct appeal. See Huff v. State, 569 So.2d 1247, 1250 (Fla.1990) (noting that for the purpose of determining the commencement of two-year time limit in which to file a motion for postconviction relief, the judgment and sentence become final when direct review proceedings are completed and the court issues the mandate). Further, it is the law at the time of Parker's new penalty phase that determines the admissibility of the evidence during that proceeding. Cf. Lawrence v. State, 691 So.2d 1068, 1072 (Fla.1997) (rejecting the defendant's argument that victim-impact evidence was not *279 admissible during his resentencing because it was not admissible at the time of his original sentencing proceeding); Dougan v. State, 470 So.2d 697, 701 n. 2 (Fla.1985) (rejecting the State's argument that the Court should apply the case law "extant at trial or when [the] case was first appealed" rather than the case law in use at the time of present appeal). Thus, Parker was not barred from litigating whether his May 7, 1982, statement was admissible in his new penalty phase.
With respect to the merits of Parker's motion to suppress, the trial court found that Parker initiated contact with police on May 7 and that Parker's waiver of rights was knowing and voluntary. Therefore, the trial court entered an order denying the motion. Parker contends this was in error. We disagree.
Generally, in reviewing a trial court's ruling on a motion to suppress, this Court accords a presumption of correctness to the trial court's findings of historical fact, reversing only if the findings are not supported by competent, substantial evidence, but reviews de novo "whether the application of the law to the historical facts establishes an adequate basis for the trial court's ruling." Connor v. State, 803 So.2d 598, 608 (Fla.2001), cert. denied, 535 U.S. 1103, 122 S.Ct. 2308, 152 L.Ed.2d 1063 (2002). However, this deference to the trial court's findings of fact does not fully apply when the findings are based on evidence other than live testimony. Cf. Thompson v. State, 548 So.2d 198, 204 n. 5 (Fla.1989) ("[T]he clearly erroneous standard does not apply with full force in those instances in which the determination turns in whole or in part, not upon live testimony, but on the meaning of transcripts, depositions or other documents reviewed by the trial court, which are presented in essentially the same form to the appellate court.").
In this case, rather than hold an evidentiary hearing, the trial court accepted a stipulated record consisting, in relevant part, of Parker's 1988 postconviction testimony and 2002 affidavit; Detective Powers' 1982 suppression hearing testimony, 1982 deposition and 2002 affidavit; Sheriff Holt's 1982 deposition; the 1988 postconviction testimony of Parker's trial attorney; and the 1988 postconviction testimony of Steven Green, an intern sent by the Public Defender's office to the jail to advise Parker on May 5, 1982. Nevertheless, we conclude that it is appropriate to give deference to the trial court's findings of fact to the extent they are supported by competent, substantial evidence. Although the judge who presided over Parker's new penalty phase and entered the order on the motion to suppress was not the original trial judge in this case, he did preside over Parker's 1988 postconviction evidentiary hearing, which was presented as part of the stipulated record and during which live testimony was presented. Because we conclude that the trial court's finding that Parker initiated the May 7 interview is supported by competent, substantial evidence and that Parker's waiver of his Fifth and Sixth Amendment rights was knowing and intelligent, we affirm the denial of the motion to suppress.
In Edwards v. Arizona, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), the United States Supreme Court held that under the Fifth Amendment, once an accused person in custody has expressed his or her desire "to deal with the police only through counsel, [that person] is not subject to further interrogation by the authorities until counsel has been made available... unless the accused, ... initiates further communication, exchanges, or conversations with the police." Id. at 484-85, 101 S.Ct. 1880 (emphasis supplied). Subsequently, the Supreme Court extended *280 the rule enunciated in Edwards to cases involving a defendant's Sixth Amendment right to counsel. See Jackson, 475 U.S. at 636, 106 S.Ct. 1404. In Jackson, the Supreme Court held that "if police initiate interrogation after a defendant's assertion, at arraignment or similar proceeding, of his right to counsel, any waiver of the defendant's right to counsel for that police initiated interrogation is invalid," and the resulting statement is inadmissible as substantive evidence against the defendant. Id.; see also Phillips v. State, 612 So.2d 557, 559 (Fla.1992) ("Once the right [to counsel] attaches under either [the Sixth Amendment or article I, section 16 of the Florida Constitution] and is invoked on a particular charge, police may not initiate questioning on that charge in the absence of counsel."). Parker argues that because he did not initiate the May 7 communication with Detective Powers, both his Fifth and Sixth Amendment rights were violated and his statement should have been suppressed.[6]
The Eleventh Circuit Court of Appeals held that the State violated Parker's Fifth Amendment right to counsel during the May 5, 1982, interview. See Parker, 974 F.2d at 1574. The State has not challenged this ruling on the mixed question of law and fact in either the trial court or on appeal. Thus, the police were prohibited under Edwards from initiating further contact with Parker until counsel was provided. The same is true under Jackson because Parker asserted his Sixth Amendment right to counsel at his May 5, 1982, arraignment when he expressed his intention to try to hire his own attorney. See Smith v. State, 699 So.2d 629, 638 (Fla. 1997) ("The Sixth Amendment right to counsel attaches at the earliest of the following points: formal charge, preliminary hearing, indictment, information, or arraignment."); see also Patterson v. Illinois, 487 U.S. 285, 290-91, 108 S.Ct. 2389, 101 L.Ed.2d 261 (1988) (rejecting the defendant's argument that because his Sixth Amendment right to counsel attached, police were barred from initiating an interview where the defendant at no time sought to exercise his right to have counsel present). Thus, the admissibility of Parker's statements to Powers, under both the Fifth and Sixth Amendments, turns on whether Parker initiated the communication with Powers and, if so, whether Parker's waiver of rights was valid; i.e., whether under the totality of the circumstances the waiver was knowing and intelligent. See Oregon v. Bradshaw, 462 U.S. 1039, 1045-46, 103 S.Ct. 2830, 77 L.Ed.2d 405 (1983) (stating that the fact that the defendant initiated a conversation with police is not alone sufficient to show a valid waiver of a previously asserted right to counsel).
The stipulated record before the trial court contained conflicting evidence on whether Parker initiated the May 7 interview with Detective Powers. Parker stated through an affidavit that he did not initiate contact with the sheriff's office. Detective Powers stated, to the contrary, that he was directed by the sheriff's office to speak to Parker pursuant to Parker's request.
Although Parker asserts that Powers' testimony alone cannot be considered competent to establish that Parker *281 initiated the May 7 interview because it is hearsay, Parker stipulated to the admissibility of this evidence and cannot now assert that the trial court was precluded from considering Powers' testimony in addressing the motion to suppress. See Laws v. State, 356 So.2d 7, 8-9 (Fla. 4th DCA 1977) ("[T]he general rule is that otherwise inadmissible evidence, received without objection, may properly be considered in determining the facts in issue."). Further, the trial court had before it the testimony of Parker's trial counsel and Steven Green, the intern sent from the Public Defender's office, which supports the trial court's finding. Parker's trial counsel testified that Parker had always represented, with respect to the May 5 interview, that he wanted to talk to the police to tell his side of the story and let the police know that what Bush was saying was not true. Green similarly testified that Parker insisted on talking with police on May 5, despite Green's advice not to do so. This additional evidence indicates that Parker was eager to communicate with police regarding Slater's murder. Thus, we conclude that the trial court's finding that Parker initiated the contact with law enforcement on May 7, 1982, is supported by competent, substantial evidence.
We further conclude that under the totality of the circumstances, Parker's May 7 waiver of his Fifth and Sixth Amendment rights was knowing and intelligent.[7]See Thompson, 548 So.2d at 204 (stating that Florida adheres to the "totality of the circumstances approach" in cases involving the wavier of constitutional rights); see also Ramirez v. State, 739 So.2d 568, 575 (Fla.1999) ("Only if the `totality of the circumstances surrounding the interrogation' reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the Miranda rights have been waived."). Parker signed a waiver of rights form, was allowed to call his mother as requested, and did not ask for an attorney during the May 7 interview. In addition, contrary to Parker's assertion, Detective Powers' written statement on the waiver form indicating that Parker was being represented by the Public Defender was not a misstatement at that time. Pursuant to a May 6, 1982, order rescinding the appointment of alternative counsel, the Public Defender was still representing Parker as of May 7, 1982. We therefore affirm the trial court's order denying Parker's motion to suppress.

II. EXCLUSION OF DEFENSE EVIDENCE
Parker next claims that the trial court erred in excluding certain defense evidence, including letters from Parker to witness Audrey Rivers, affidavits of various unavailable witnesses, and portions of witness Richard Barlow's testimony. We conclude that the trial court did not abuse its discretion in excluding this evidence.

A. Letters From Parker to Audrey Rivers
Audrey Rivers, who met Parker during her employment with the Florida Volunteer Lawyers Resource Center, testified regarding her friendship with Parker. In conjunction with Rivers' testimony, Parker sought to submit into evidence several letters that he wrote to Rivers during the time he was incarcerated for this crime. The State objected. The trial court sustained the State's objection, finding that the letters would be cumulative of other evidence, but did not prevent Rivers from characterizing portions of the letters from Parker. Parker contends that this ruling was in error. We disagree.
*282 Section 90.403, Florida Statutes (2003), provides that "[r]elevant evidence is inadmissible if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of issues, misleading the jury, or needless presentation of cumulative evidence." (Emphasis supplied.) In Mendoza v. State, 700 So.2d 670 (Fla. 1997), we held that the trial court did not err in excluding defense evidence of an application for political asylum in part because the document "was merely a self-serving statement filed in the public records." Id. at 675. We further concluded that given the testimony of the defendant's mother about his childhood, the document would have been cumulative. See id.
In this case, the trial court explicitly ruled that Rivers could characterize the contents of the letters. In fact, Rivers testified as to the types of things Parker wrote about, explaining that in some of the letters Parker expressed deep concern for her family, and in others, he expressed concern for his own family. Rivers then discussed the contents of a number of Parker's letters. For example, Rivers testified that in one letter Parker wrote about being "taken from his cell to see the physician" and "describing what a heavenly sight it was to see freshly raked leaves in a rose garden." Because the letters were cumulative of other evidence and because the trial court allowed Rivers to characterize the contents of the letters, we conclude that the trial court did not abuse its discretion in refusing to admit the letters themselves into evidence.

B. Affidavits of Unavailable Witnesses
Parker also asserts that the trial court erred in failing to admit certain affidavits of witnesses who were found to be unavailable to testify during his penalty phase. These witnesses were Elmira Parker (Parker's deceased mother), Douglas Smith (the companion of Parker's mother who is also deceased), Katie Lee Parker (Parker's sister who is suffering from Alzheimer's and is therefore incompetent to testify), Rosie Lee Parker (Parker's sister), and Gloria Marshall and Martha Rahming (both former teachers).
This Court has recognized that "even though section 921.141(1)[[8]] relaxes the evidentiary rules during the penalty phase of a capital trial" a party cannot introduce hearsay evidence unless the opposing party has a fair opportunity to rebut the hearsay. See Blackwood v. State, 777 So.2d 399, 411 (Fla.2000). In Blackwood, we upheld the exclusion of the deceased victim's hearsay statements to a friend, explaining that the State had no fair opportunity to rebut because the State could not question the victim. See id. at 412.
In this case, the trial court allowed the introduction of the affidavits only to the extent that the information contained therein related to family history as specified in section 90.804(2)(d), Florida Statutes (2003).[9] In deciding to exclude the *283 remainder of the information contained in the affidavits, the trial court concluded that the State had no fair opportunity to rebut their contents. We agree with this determination and conclude that the trial court did not err in excluding the affidavits.

C. Richard Barlow's Testimony
Lastly, Parker contends that the trial court erred by limiting the testimony of former assistant state attorney Richard Barlow, who presented the testimony of Michael Bryant during Cave's 1993 penalty phase to establish that Cave was the shooter. Specifically, Parker argues that the trial court erred in precluding Barlow from testifying both as to what Bryant had told Barlow during their conversations prior to Cave's trial and as to Barlow's professional considerations in evaluating Bryant's statement in conjunction with the medical examiner's evidence. We find no error in the trial court's exclusion of this evidence.
Parker asserts that Bryant's statement to Barlow is not hearsay because it was not offered to prove the truth of the statement but rather to show that Bryant's statements to both Barlow and Arthur Jackson were consistent. Essentially, Parker was attempting to bolster Bryant's own testimony, which was subsequently read to the jury in this trial. "We have long held that prior consistent statements `are generally inadmissible to corroborate or bolster a witness' trial testimony.' " Chandler v. State, 702 So.2d 186, 197 (Fla.1997) (quoting Rodriguez v. State, 609 So.2d 493, 499 (Fla. 1992)). In addition, because Bryant's prior testimony was read to the jury, any testimony from Barlow about what Bryant said would have been cumulative. See Mendoza, 700 So.2d at 675. Thus, it was within the trial court's discretion to preclude Barlow's testimony on this issue.
With respect to the exclusion of Barlow's professional considerations in evaluating the credibility of Bryant's statements, the trial court sustained the State's objection to this line of questioning, ruling that the prosecutor's "actual professional thought process" in evaluating a witness was not relevant. However, the trial court subsequently recognized during cross-examination that the State had opened the door to Barlow's mental processes and that on redirect Parker would be allowed to question Barlow on this issue. It was Parker's responsibility to reopen this line of questioning, which he failed to do. We therefore conclude that the trial court did not commit reversible error in sustaining the objection to testimony about the prosecutor's evaluation of Bryant as a witness.

III. PROSECUTOR'S CLOSING ARGUMENT
In Parker's next issue on appeal he asserts that the trial court erred in failing to grant his motion for a mistrial after the prosecutor made an improper comment during closing argument. The comment at issue occurred during the prosecutor's discussion of the testimony of Georgeann Williams, codefendant Bush's girlfriend at the time of the murder:
But Georgeann Williams is the one who knows what was said and done. So what you have to look at is, can she be believed? Is her testimony worthy of belief? Why is it? Well, first of all, the testimony that she gave here in this courtroom was consistent, completely consistent with the testimony that she gave not only against this Defendant, but against her own boyfriend. She testified in both of their trials.
When she went to the jail to visit John Earl Bush and he told her, "I stabbed the girl but Parker shot her." She wanted to believe that. But she *284 couldn't be sure if she could believe that. She had to hear it from Parker. So she said she went over to his cell.
(Emphasis supplied.)
Parker objected and moved for a mistrial, arguing that Williams never testified that Bush told her Parker was the shooter. In fact, Williams testified at trial that during her conversation with Parker at the county jail, Parker told her that Bush stabbed Slater and he (Parker) shot Slater. The prosecutor agreed that Williams did not testify that Bush made a statement that Parker was the shooter and offered to correct the misstatement. Based on the prosecutor's promise to correct the argument, the trial court denied Parker's motion for a mistrial. When closing arguments resumed, the prosecutor made the following correction:
Ladies and Gentleman, what Counsel just brought to the attention of the Judge is that at sometime during my argument, that apparently he picked up that I said that Georgeann Williams testified that John Earl Bush told her that Parker did the shooting. That's not evidence in this case. That's not evidence at all. I don't recall saying that, but I don't doubt it if that's what he said I did. That is not evidence and it's not something you should consider because that wasn't said. Our contention is that it was Parker who admitted to Georgeann Williams that he did the shooting. She did talk to Bush and then she went to Parker because she wanted to know from Parker what had happened and Parker told her that he shot Frannie Slater, John Earl Bush stabbed her. If I said anything other than that I didn't intend to and certainly wouldn't want you to consider what's not evidence in this case. So let's move on.
We conclude that the trial court properly denied Parker's motion for mistrial because the prosecutor's misstatement in this case was harmless beyond a reasonable doubt.[10] The prosecutor corrected his misstatement by telling the jury that no evidence was presented that Bush told Williams that Parker was the shooter and that the jury should disregard his comment to that effect. The prosecutor also told the jury that the State's contention was that Parker told Williams that he shot the victim, which is what Williams testified to during the penalty phase. Thus, the prosecutor effectively corrected any error in his previous argument, and we conclude that there is no reasonable possibility that this isolated comment affected the jury's decision to recommend death. Cf. Hitchcock v. State, 755 So.2d 638, 643 (Fla.2000) (finding the prosecutor's erroneous comments during closing arguments about what the jury could consider in mitigation harmless where the comments were followed by a correct explanation of mitigation and where the judge gave the mitigating circumstance at issue "some weight" in the sentencing order). Accordingly, we affirm the trial court's denial of the motion for mistrial.

IV. TRIAL COURT'S MISSTATEMENT DURING VOIR DIRE
Parker also contends that the trial court erred in denying his motion for a mistrial based on the trial court's misstatement made during voir dire. We conclude *285 that the trial court did not abuse its discretion in denying a mistrial.
After the venire panel was sworn, the trial court made the following comments about the nature of the case, which are pertinent to this issue on appeal:
Now, let me tell you what we're here on. This is the case of the State of Florida versus J.B. Parker. Now in this case the reason we are here as I've mentioned is not to determine whether Mr. Parker is guilty of a crime, that has been determined at an earlier time. Mr. Parker has been found guilty of murder in the first degree.... And the specific reason for which we are impaneling a jury in this case is to determine what is the appropriate sentence, whether Mr. Parker should be sentenced to the death penalty or should be sentenced to life in prison.... This is a case, and I'm going to read from the original charge, where Mr. Parker has been charged and as indicted found guilty of the crime of first degree murder and he has been convicted of the unlawful and premeditated death of a human being by killing and murdering Frances Julia Slater, a human being, on or about April 27, 1982, in Martin County, Florida.
(Emphasis supplied.) Defense counsel moved for a mistrial and to strike the venire panel because the trial court misstated that Parker was convicted of premeditated murder when, in fact, the jury returned a general verdict convicting Parker of first-degree murder after being instructed that it could rely on either premeditation or felony-murder. The trial court denied the motion and then made the following statement to the venire panel:
Members of the potential jury. In this case I have read you what the indictment, the original indictment stated. At the trial at which Mr. Parker was convicted, the State had two theories of first degree murder, one is premeditated murder and the other is felony murder during the course of a robbery or kidnapping and Mr. Parker was convicted of first degree murder after that case was submitted to himor submitted to the jury and the lawyers may want to talk with you a little bit further about some of this that I've mentioned here.
On appeal, Parker asserts that the trial court's statement that he had been convicted of premeditated murder denied him a fair trial.[11]
In Franqui v. State, 804 So.2d 1185, 1192 (Fla.2001), we considered the defendant's claim that the trial court erred in stating during voir dire that the law required the jury to recommend a death sentence if jurors believed that the aggravating circumstances outweighed the mitigating circumstances. We concluded that the trial court's "isolated misstatements of the law during voir dire" were harmless. Id. at 1194. In determining that the error was harmless, we noted that the trial court's subsequent comments to the venire panel were consistent with the standard jury instruction on the issue, and that "[m]ore importantly," the trial court did not repeat the misstatement when it instructed the jury before deliberations. Id. at 1193.
In this case, the circumstances supporting a finding of harmless error are even *286 stronger than those presented in Franqui. The trial court initially misstated that Parker had been "found guilty of the crime of first degree murder and ... been convicted of the unlawful and premeditated death of a human being by killing and murdering Frances Julia Slater." However, the court did not repeat this misstatement and properly instructed the jurors prior to deliberations that their duty was to advise the court "as to what punishment should be imposed upon the Defendant for his crime of first degree murder." (Emphasis supplied.) In addition, and unlike the trial court in Franqui, the trial court in this case corrected its misstatement after Parker objected. Cf. Burns v. State, 609 So.2d 600, 604 (Fla.1992) (holding that the defendant's due process rights were not violated when the trial court misspoke by instructing jurors to find the defendant guilty if the offense was "proved to your satisfaction by the greater weight of the evidence" but immediately corrected the misstatement and again explained, before allowing the jury to resume deliberations, the proper standard of proof). Therefore, we conclude that the trial court did not abuse its discretion in denying Parker's motion for mistrial.

V. AGGRAVATING CIRCUMSTANCES
In issues five through eight on appeal, Parker challenges the trial court's finding of the HAC aggravator, the CCP aggravator, the avoid arrest aggravator, and the pecuniary gain aggravator.[12] Although the trial court must determine whether the State has proven each aggravating circumstance beyond a reasonable doubt, this Court's task on appeal is to review the record to determine whether the trial court applied the right rule of law for each aggravating circumstance and, if so, whether competent, substantial evidence supports its finding. See Gore v. State, 784 So.2d 418, 432 (Fla.2001). After reviewing the record in this case, we conclude that competent, substantial evidence supports the trial court's findings of the HAC, CCP, avoid arrest, and pecuniary gain aggravators.

A. HAC
"To qualify for the HAC circumstance, `the crime must be both conscienceless or pitiless and unnecessarily torturous to the victim.'" Hertz v. State, 803 So.2d 629, 651 (Fla.2001) (quoting Richardson v. State, 604 So.2d 1107, 1109 (Fla.1992)). We have held that "an instantaneous or near-instantaneous death by gunfire does not satisfy the aggravating circumstance of heinous, atrocious, or cruel," Robinson v. State, 574 So.2d 108, 112 (Fla.1991), and that "[e]xecution-style killings are not generally HAC unless the state has presented other evidence to show some physical or *287 mental torture of the victim." Hartley v. State, 686 So.2d 1316, 1323 (Fla.1996).
Parker contends that the trial court erred in finding the HAC aggravator because the only direct evidence on the issue of whether the crime was conscienceless or pitiless was the testimony of Parker's codefendant Johnson, which flatly contradicts the trial court's conclusion that the victim was "begging that her life not be taken." Parker also contends that the trial court's findings that (1) "[h]air from the victim, consistent with being ripped from her head, was found in Bush's car"; (2) "[t]he victim's bladder was completely voided"; (3) the "excruciatingly painful stab wound" was inflicted while the victim struggled; and (4) "[t]he killing was not sudden and unexpected," are not supported by the evidence.
We recently affirmed a finding of HAC in codefendant Cave's case on evidence showing that Cave personally removed Slater from the store at gunpoint, heard her pleas for her life during the ride to an isolated area, and removed her from the car, turning her over to Bush and Parker, who stabbed and shot her. See Cave v. State, 727 So.2d 227, 229 (Fla.1998). In this case, the trial court made similar findings on the HAC aggravator:
The victim suffered fear, emotional strain, and terror during the events leading up to the actual killing. The victim, an eighteen year old girl, was afraid to work on the night of her abduction. She experienced great fear and terror during the robbery and during the thirteen mile, twenty minute ride to her death. She was frightened and was asking what the defendants were going to do to her, in effect begging that her life not be taken. Hair from the victim, consistent with being ripped from her head, was found inside Bush's car. The victim's bladder was completely voided while she was alive, prior to being shot. While she was alive she suffered an excruciatingly painful stab wound to her abdomen from a filleting type of fishing knife. The evidence clearly established that the stab wound was inflicted while she struggled. A defensive injury received during a struggle was found on her hand. The killing was not sudden and unexpected.
(Emphasis supplied.)
The record reflects that the trial court's findings are supported by competent, substantial evidence. Testimony from a number of witnesses established that Slater was driven from the store where she was working to a remote location thirteen miles away. Although codefendant Johnson testified that Slater was told she was going to be let go, he also testified that she was frightened and continued to ask what they were going to do with her. The medical examiner testified that the stab wound in Slater's abdomen would have been a "painful wound," that it was inflicted while Slater was alive, and that the trajectory of the bullet was consistent with Slater being stabbed, falling to her knees and then being shot in the back of the head. The medical examiner also testified that Slater had completely emptied her bladder before death, which would be consistent with either fear or the pain of being stabbed. Lastly, Daniel Nippes, an expert in fiber and hair comparison, testified that he found a head hair from Slater in Bush's car. Nippes opined that the follicular tissue attached to the hair indicated that it did not naturally fall out of Slater's scalp but rather was "prematurely removed."[13] *288 Because of the competent, substantial evidence presented, we find no error in the trial court's finding of HAC.

B. CCP
With respect to the CCP aggravating circumstance, Parker argues that but for the fact that he was in the store where the victim worked two or three hours before the murder, the State presented no evidence that he acted with the requisite cool and calm reflection and premeditation. Parker also argues that codefendant Johnson's testimony that Slater was told she was going to be let go contradicts the trial court's finding that "[t]here was no discussion among the defendants as to what they would do with her; her fate was a foregone conclusion."
To support a finding of the CCP aggravator, the evidence must show
that the killing was the product of cool and calm reflection and not an act prompted by emotional frenzy, panic, or a fit of rage (cold), and that the defendant had a careful plan or prearranged design to commit murder before the fatal incident (calculated), and that the defendant exhibited heightened premeditation (premeditated), and that the defendant had no pretense of moral or legal justification.
Jackson v. State, 648 So.2d 85, 89 (Fla. 1994) (citations omitted). Although a plan to commit murder cannot be inferred solely because the defendants planned to commit another felony, see Hertz, 803 So.2d at 650, "[c]old, calculated, premeditated murder can be indicated by the circumstances showing such facts as advance procurement of a weapon, lack of resistance or provocation, and the appearance of a killing carried out as a matter of course." Bell v. State, 699 So.2d 674, 677 (Fla.1997). In addition, we have "previously found the heightened premeditation required to sustain this aggravator where a defendant has the opportunity to leave the crime scene and not commit the murder but, instead, commits the murder." Alston v. State, 723 So.2d 148, 162 (Fla.1998).
As with the HAC aggravator, we upheld the finding of CCP in codefendant Cave's case. See Cave, 727 So.2d at 229. In that case, the evidence supporting CCP showed that Cave had the gun during the robbery, led the victim out of the store at gunpoint, kept the victim in the back seat of the car for the long ride out to the murder scene, and turned her over to Bush and Parker, who knifed and shot her. See id. In Parker's sentencing order, the trial court explained:
The defendant carefully "cased" out the store two to three hours before the robbery. Upon returning to the store, Parker entered the store with Cave and Bush, all three actively participating in the robbery. None of the three defendants took steps to conceal their identity. Although the victim could have been secured in the store, the defendants took her out to the car. There was no discussion among the defendants as to what they would do with her, her fate was a foregone conclusion. At the scene of the killing Parker initiated her murder by reaching over and demanding the gun from Cave, stating, "Hand me the gun". *289 Parker admitted later to actually shooting the victim in the head.

(Emphasis supplied.)
The record supports the trial court's finding of CCP. The defendants deliberately armed themselves with a knife and gun, removed Slater from the store after the robbery, and then drove thirteen miles to a remote location where Parker asked for the gun and then shot Slater execution-style in the back of the head. Further, no evidence was presented that Slater's murder occurred suddenly as the result of a struggle, see Barwick v. State, 660 So.2d 685, 696 (Fla.1995) (finding the CCP aggravator inapplicable where the evidence showed that the murder occurred when the victim resisted during a struggle and the evidence did not show the defendant planned to kill the victim), or was committed in a rash or spontaneous way. See Mahn v. State, 714 So.2d 391, 398 (Fla. 1998) (concluding that the trial court erred in finding CCP where the "rash and spontaneous killing evidenced no analytical thinking, no conscious and well-developed plan to kill"). Thus, we conclude that the trial court did not err in finding CCP as an aggravating factor.

C. Avoid Arrest Aggravator
This Court has explained the circumstances under which the avoid arrest aggravator is appropriately found:
The avoid arrest/witness elimination aggravating circumstance focuses on the motivation for the crimes. Where the victim is not a police officer, "the evidence [supporting the avoid arrest aggravator] must prove that the sole or dominant motive for the killing was to eliminate a witness," and "[m]ere speculation on the part of the state that witness elimination was the dominant motive behind a murder cannot support the avoid arrest aggravator." However, this factor may be proved by circumstantial evidence from which the motive for the murder may be inferred, without direct evidence of the offender's thought processes.

In other cases, this Court has found it significant that the victims knew and could identify their killer. While this fact alone is insufficient to prove the avoid arrest aggravator, we have looked at any further evidence presented, such as whether the defendant used gloves, wore a mask, or made any incriminating statements about witness elimination; whether the victims offered resistance; and whether the victims were confined or were in a position to pose a threat to the defendant.
Farina v. State, 801 So.2d 44, 54 (Fla.2001) (citations omitted) (emphasis supplied).
In the sentencing order in this case, the trial court found:
The evidence establishes that the purpose of the abduction and killing was clearly to eliminate the only witness to the robbery. This was the sole or domin[ant] motive in killing the victim. The evidence also establishes that the defendant had been seen twice while he was in the Lil' General, once alone when he was "casing" the store, and then later with Bush and Cave during the robbery itself. Both times the defendant made no effort to conceal his identity. There were places in the Lil' General Store where the victim could have been locked up by the defendants in order to prevent her from calling the police, but they elected to remove her from the store. Immediately prior to the victim's being shot, Parker reached over to Alphonso Cave and commanded "Hand me the gun". The defendant then took the gun from Cave and exited the car and was personally present during the shooting. As the defendants fled from the [site] of the killing Parker advised Bush regarding *290 disposing of the knife used to stab the victim. There was a discussion in the car regarding killing Deputy Bargo who stopped them after the murder of the victim.

(Emphasis supplied.)
In codefendant Cave's most recent penalty-phase appeal, we approved the finding of the avoid arrest aggravator, stating:
There was little reason for the men to kidnap Slater except to kill her at their leisure in isolated surroundings where they would not be surprised or observed; and there was no other reason to kill hershe was not shot accidently or in an escape attempt.
See Cave, 727 So.2d at 230. The same circumstances established in Cave to support the avoid arrest aggravator were established in this case against Parker. Evidence was presented that there were several places in the store the defendants could have left Slater in order to make their escape. However, the defendants chose to drive Slater to a remote location where she was killed by a single gunshot to the back of the head. Parker then told Bush to get rid of the knife after the murder. Further, after the killing the defendants discussed killing Deputy Bargo when he pulled them over for a routine traffic stop.
We have affirmed the finding of the avoid arrest aggravator in similar circumstances. See Hertz, 803 So.2d at 648-49 (finding the avoid arrest aggravator proper when the defendants expressed an apprehension about being arrested and were not prevented from leaving the premises once they secured the victims' property); Knight v. State, 746 So.2d 423, 435 (Fla. 1998) (concluding that although the issue was contested, the defendant "had some purpose in mind in killing the victims execution style at the end of his rambling journey to a remote location," and the evidence supported the trial court's finding of the avoid arrest aggravator); Preston, 607 So.2d at 409 (acknowledging that the avoid arrest aggravator may apply where a victim is abducted from the scene of a crime, transported to a different location, and killed). We find no error in the trial court's finding of the avoid arrest aggravator in this case.

D. Pecuniary Gain Aggravator
Parker's final challenge to the aggravating factors found by the trial court concerns the pecuniary gain aggravator. Parker argues that in order for this aggravator to apply, the evidence must prove that the motive for the murder, not the underlying robbery, was pecuniary gain. We disagree.
We have previously found the pecuniary gain aggravator applicable where the "murder was the culmination of a course of events that began when appellant went into a store, robbed the clerk at gunpoint, and abducted her from the store." Copeland v. State, 457 So.2d 1012, 1019 (Fla. 1984). More recently, in Card v. State, 803 So.2d 613, 625-26 (Fla.2001), we rejected the defendant's argument that because the "pecuniary gain aggravator is only applicable where the State proves that pecuniary gain was the sole or dominant motive for the murder," it is inconsistent to apply both the pecuniary gain and avoid arrest aggravators. We then approved the trial court's finding of the pecuniary gain aggravator based on evidence that the defendant "stole $1,197 from the Western Union office and used some of the proceeds to repay a debt." Id. at 626.
In this case, Parker and his codefendants took $134 from the store and split the proceeds after the murder. The murder was the culmination of events that began when the defendants went into the store to commit the robbery and abducted *291 Slater at gunpoint. The trial court's finding of the pecuniary gain aggravator is supported by competent, substantial evidence.

VI. PROPORTIONALITY
Parker next asserts that in assigning little or no weight to the evidence in mitigation, the "trial court ... abrogated its responsibilities." Parker also contends that his death sentence is disproportionate.
We explained in Campbell v. State, 571 So.2d 415, 420 (Fla.1990) that "the relative weight given each mitigating factor is within the province of the sentencing court," but cautioned that once a mitigating factor is found it could not be dismissed as having no weight. See also Cole v. State, 701 So.2d 845, 852 (Fla.1997) ("Deciding the weight to be given a mitigating circumstance is within the trial court's discretion...."). In Trease v. State, 768 So.2d 1050, 1055 (Fla.2000), we receded from Campbell to the extent it precluded a trial court from giving no weight to an established mitigator. We recognized that "while a proffered mitigating factor may be technically relevant and must be considered by the sentencer because it is generally recognized as a mitigating circumstance, the sentencer may determine in the particular case at hand that it is entitled to no weight for additional reasons or circumstances unique to that case." Id.
In this case, the trial court found one statutory mitigator, that Parker was nineteen at the time of the crime, assigning it very little weight, and gave little or no weight to eleven of the nonstatutory mitigators presented by Parker. However, the trial court gave moderate weight to two of the nonstatutory mitigatorsthat Parker cooperated with law enforcement and that Parker left school to help support his family, was a good and loving son and brother, was not violent as a child, and assisted his teenage girlfriend in learning to read and drive. In addition, consistent with our decision in Campbell, the trial court issued a detailed sentencing order evaluating both the statutory and nonstatutory mitigation proposed by Parker. See 571 So.2d at 419 ("When addressing mitigating circumstances, the sentencing court must expressly evaluate in its written order each mitigating circumstance proposed by the defendant to determine whether it is supported by the evidence and whether, in the case of nonstatutory factors, it is truly of a mitigating nature."). We therefore conclude that the trial court did not abuse its discretion in assigning minimal or no weight to several of the mitigating circumstances established by Parker.
With respect to proportionality, this Court performs proportionality review to prevent the imposition of "unusual" punishments contrary to article I, section 17 of the Florida Constitution. Tillman v. State, 591 So.2d 167, 169 (Fla.1991). "The death penalty is reserved for `the most aggravated and unmitigated of most serious crimes.'" Clark v. State, 609 So.2d 513, 516 (Fla.1992) (quoting State v. Dixon, 283 So.2d 1, 7 (Fla.1973)). In deciding whether death is a proportionate penalty, the Court considers the totality of the circumstances of the case and compares the case with other capital cases. See Urbin v. State, 714 So.2d 411, 417 (Fla. 1998). However, this proportionality review "is not a comparison between the number of aggravating and mitigating circumstances." Sexton v. State, 775 So.2d 923, 935 (Fla.2000) (quoting Porter v. State, 564 So.2d 1060, 1064 (Fla.1990)).
Despite Parker's argument to the contrary, we conclude that he is equally as culpable as both Bush and Cave in Slater's murder. The evidence established that *292 Parker gave Cave the gun before Parker, Cave, and Bush went into the convenience store, that Parker was an active participant in the robbery, and that Parker demanded the gun from Cave when they arrived at the deserted area with Slater. Finally, evidence was presented through Williams' testimony that Parker admitted committing the shooting. These actions by Parker make him as culpable as Bush and Cave in Slater's murder. In addition, Parker's death sentence in this case is proportionate when compared to other cases where the death sentence has been upheld. See, e.g., Card, 803 So.2d at 618-19, 629 (affirming the death sentence where evidence established five aggravatorsmurder committed during the course of a kidnapping, murder committed for pecuniary gain, murder committed to avoid lawful arrest, CCP, and HACseven nonstatutory mitigators were found by the trial court and two nonstatutory mitigators were considered and weighed by this Court); Alston, 723 So.2d at 153, 162 (affirming death sentence where evidence established five aggravatorsprevious conviction of three violent felonies, murder committed during the course of a robbery/kidnapping and for pecuniary gain, murder was committed to avoid lawful arrest, CCP, and HACand five nonstatutory mitigators, including that the defendant had a horribly deprived and violent childhood, had low intelligence and cooperated with law enforcement).

VII. ADMISSION OF STATEMENTS OF AN UNIDENTIFIED PERSON
In Parker's next issue on appeal, he asserts that the trial court erred by allowing the State to rehabilitate a witness with inadmissible statements of an unidentified person. Specifically, Parker argues that the State should not have been permitted to ask Deputy Timothy Bargo about a statement made by an unidentified person during his deposition. Parker contends that the statement was hearsay and violated his Sixth Amendment right of confrontation. We conclude that this argument is meritless.
A review of the record indicates that Bargo never recounted the statement made by the unidentified person. The only time the actual statement was mentioned before the jury was when the State asked Bargo: "Now if one of the defense attorneys had in some way stated Mr. Parker was the one that was helping Mr. Bush with the battery, would that have you would have heard that and that would be in this record." When questioning resumed after Parker's objection, the State only asked Bargo to look at the statement and then asked if he recalled "that statement being" made at his deposition. Bargo responded no and the State asked if he made the statement. Bargo again responded no because he was never able to identify any of the passengers other than by the false names given to him on the morning he stopped Bush's car. Because the actual statement made by the unidentified person was never introduced into evidence, it is not subject to a hearsay or confrontation challenge, and we conclude that the trial court did not err in overruling Parker's objection.

VIII. INCONSISTENT TRIGGERMAN THEORIES
Parker also contends that the State's inconsistent triggerman theoriesthat Cave was the shooter during Cave's trial and that Parker was the shooter during Parker'sviolated his due process rights. In Parker's most recent appeal, we concluded that in using Bryant's testimony during Cave's 1993 penalty phase to show that Cave was the shooter, the State had relied not only on inconsistent positions, *293 which the Eleventh Circuit found permissible, see Parker, 974 F.2d at 1578, but also on inconsistent evidence. See Parker, 721 So.2d at 1151. Because this favorable evidence was suppressed by the State, we affirmed the trial court's postconviction order granting Parker a new penalty phase in order to give Parker the opportunity to present evidence of the State's inconsistent theories to the jury. See id.
However, we rejected Parker's argument on cross-appeal that the suppression of this evidence undermined confidence in the outcome of the guilt phase and that under Green v. Georgia, 442 U.S. 95, 99 S.Ct. 2150, 60 L.Ed.2d 738 (1979), the State's use of this inconsistent evidence violated his due process rights. We concluded that Bryant's testimony went "only to a determination regarding premeditated murder," and was not relevant to a finding of felony murder, which was established by the evidence. Parker, 721 So.2d at 1152. We noted:
The underlying rationale in Green was that the defendant was deprived of a fair trial as to punishment because he was not allowed to introduce evidence that had been used by the State in a codefendant's trial to establish that the codefendant was the one who actually murdered the victim.
Id. (emphasis supplied). Because Parker was able to present Bryant's testimony to the jury during the new penalty phase, we conclude that the State's use of inconsistent evidence during Cave's 1993 penalty phase did not violate Parker's due process rights during his de novo penalty phase.

IX. AUTHORITY OF TRIAL JUDGE TO PRESIDE OVER PENALTY PHASE
Parker's next issue on appeal involves the authority of Judge Geiger to preside over his penalty phase. Parker argues that the administrative order entered by former Chief Justice Harding appointing Judge Geiger is void because Chief Judge Kanarek requested the appointment of Judge Geiger after Judge Kanarek had recused himself from Parker's case. Parker also argues that Judge Kanarek erred in polling the judges of the Nineteenth Judicial Circuit to ascertain whether any other judge would be able to sit on Parker's case after he had granted the motion to disqualify.
At the time of Parker's penalty phase, Judge Kanarek was the Chief Judge of the Nineteenth Judicial Circuit and was specially assigned to Parker's case by former Chief Justice Harding. When Judge Kanarek recused himself from Parker's case, he lacked the authority to make additional rulings on Parker's case. See § 38.10, Fla. Stat. (2003) (stating that whenever a party files a legally sufficient motion to disqualify "the judge shall proceed no further"). However, as chief judge, Judge Kanarek had a separate and distinct role as the administrative head of the circuit and, thus, an administrative duty to ascertain whether another judge of the Nineteenth Judicial Circuit could hear the case and to report this fact to the Chief Justice. See art. V, § 2(d), Fla. Const. ("The chief judge shall be responsible for the administrative supervision of the circuit courts and county courts in his circuit."); Fla. R. Jud. Admin. 2.050(b)(4) ("If a judge is ... disqualified in an action ... the chief judge or the chief judge's designee may assign a proceeding pending before the judge to any other judge or any additional assigned judge of the same court...."). When Judge Kanarek polled the other judges of his circuit he was not acting as the judge presiding over Parker's case, but rather in his administrative capacity as the chief judge of the circuit. Further, the actions taken by Judge Kanarek after his recusal were purely ministerial in nature and resulted *294 in no substantive rulings on Parker's case. Cf. Fischer v. Knuck, 497 So.2d 240, 243 (Fla.1986) (stating that a judge has the authority to perform the ministerial act of reducing a prior ruling to writing subsequent to the filing of a motion to disqualify). Thus, we reject Parker's assertion that Judge Kanarek's actions were improper and that Judge Geiger did not have the authority to preside over Parker's penalty phase.

X. CIRCUMSTANTIAL EVIDENCE INSTRUCTION
Parker next asserts that the trial court abused its discretion in denying his request for a special jury instruction on circumstantial evidence. This Court eliminated the standard jury instruction on circumstantial evidence, finding it unnecessary in light of the required instruction on reasonable doubt. See In re Standard Jury Instructions in Criminal Cases, 431 So.2d 594, 595 (Fla.1981). Although the trial court can give the circumstantial evidence instruction, we have "expressly approved courts which have exercised their discretion and not given the instruction." Monlyn v. State, 705 So.2d 1, 5 (Fla.1997). We conclude that the trial court did not abuse its discretion in this case in denying Parker's request.

XI. EIGHTEEN YEARS BETWEEN INDICTMENT AND NEW PENALTY PHASE
Parker asserts that eighteen years between the indictment and the new penalty phase in his case constitutes cruel and unusual punishment under the Eighth Amendment to the United States Constitution and violates his due process rights because persons who were available to provide mitigation evidence at the original trial were no longer able to testify at the penalty phase. We have previously rejected the argument that a seventeen-year span between a defendant's arrest and his second penalty phase was cruel and unusual punishment. See Hitchcock v. State, 673 So.2d 859, 863 (Fla.1996). Similarly, we conclude that no constitutional violation occurred as the result of the delay in Parker's case.

XII. APPRENDI and RING

Finally, Parker argues that under the United States Supreme Court's decisions in Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), and Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), the Florida death penalty statute violates the Sixth Amendment of the United States Constitution. However, in addition to a conviction for first-degree murder, Parker was convicted by a unanimous jury of kidnapping and robbery. One of the aggravating factors found by the trial court was that Parker committed the murder in the course of a kidnapping. We recently denied relief on this issue in a direct appeal where the murder occurred in the course of the enumerated felonies of robbery and kidnapping, which were supported by separate guilty verdicts. See Caballero v. State, 851 So.2d 655, 663-64 (Fla.2003). Parker is likewise not entitled to relief.

CONCLUSION
Having considered and rejected Parker's challenges to his sentence, we affirm the death sentence in this case.
It is so ordered.
WELLS, PARIENTE, LEWIS, QUINCE, and CANTERO, JJ., concur.
ANSTEAD, C.J., concurs specially with an opinion.
*295 ANSTEAD, C.J., specially concurring.
I concur in the majority opinion in all respects except for its discussion of the decision in Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002).
NOTES
[1] We have jurisdiction over all death penalty appeals. See art. V, § 3(b)(1), Fla. Const.
[2] In its sentencing order, the trial court explicitly considered and gave no weight to the following statutory mitigators: (1) the capital felony was committed while the defendant was under the influence of extreme mental or emotional disturbance; (2) the defendant was an accomplice in the capital felony committed by another person and his participation was relatively minor; (3) the defendant acted under extreme duress or under the substantial domination of another; and (4) the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired.
[3] The nonstatutory mitigators the trial court found were: (1) the defendant cooperated with law enforcement (moderate weight); (2) the defendant had an abused or deprived childhood, experienced childhood hunger, was raised in poverty, was raised without a father figure, and was left unsupervised at home (little weight); (3) the defendant is psychologically classified as a follower (very little weight); (4) the defendant's behavior in prison has been good for the most part (very little weight); (5) the defendant does well in a structured environment such as prison (very little weight); (6) the defendant exhibited appropriate behavior during his trials (very little weight); (7) the defendant developed a relationship with Audrey Rivers, a woman who visited him somewhat regularly (very little weight); (8) the defendant was under the influence of alcohol on the night of the crime (very little weight); (9) the defendant performed well as a public school athlete (little weight); (10) the defendant is a slow learner and was teased as a child (little weight); (11) the defendant left school to help his family, was not a violent or cruel child, was a kind and helpful child, and protected his family (moderate weight); (12) the defendant treated his teachers with respect and was not an aggressive child (little weight); and (13) the lapse of time between the defendant's first trial and the current penalty phase was caused by the State's discovery violation (very little weight).
[4] Parker claims that (1) the trial court erred in denying Parker's motion to suppress; (2) the trial court erroneously excluded certain defense evidence; (3) the trial court erred in failing to grant a motion for mistrial based on the prosecutor's improper comment during closing argument; (4) the trial court's misstatement to the venire panel denied Parker the right to a fair trial; (5) the trial court erred in finding HAC; (6) the trial court erred in finding CCP; (7) the trial court erred in finding the avoid arrest aggravator; (8) the trial court erred in finding the pecuniary gain aggravator; (9) the trial court failed to assign the proper weight to the mitigating factors established and Parker's death sentence is disproportionate; (10) the felony murder aggravator is unconstitutional on its face and as applied; (11) the trial court erred in allowing the State to rehabilitate a witness with statements of an unidentified person; (12) the State's use of inconsistent "triggerman" theories is a violation of Parker's due process rights; (13) the trial judge lacked the authority to preside over the penalty-phase proceeding; (14) Florida's death penalty statute is unconstitutional under Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), and Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002); (15) the delay between Parker's indictment and new penalty phase constitutes cruel and unusual punishment in violation of the Eighth Amendment; and (16) the trial court erred in denying Parker's request for a special jury instruction on circumstantial evidence.
[5] The Court held in Jackson that if police officers initiate an interrogation after a defendant asserts his or her Sixth Amendment right to counsel, any waiver of the right for that police-initiated interrogation is invalid. See 475 U.S. at 636, 106 S.Ct. 1404.
[6] The State asserts that because Parker's original trial took place prior to the Jackson decision and this Court decided that Jackson was not to be applied retroactively, see Henderson v. Dugger, 522 So.2d 835, 837 (Fla.1988), this Court need not reach the merits of Parker's Sixth Amendment claim. However, as previously explained, because the new penalty phase was a new proceeding, neither the trial court nor this Court is precluded from applying case law rendered after the original sentencing.
[7] Parker does not argue that his statement to Detective Powers on May 7 was involuntary.
[8] Section 921.141(1), Florida Statutes (2003), provides that "[a]ny such evidence which the court deems to have probative value may be received, regardless of its admissibility under the exclusionary rules of evidence, provided the defendant is accorded a fair opportunity to rebut any hearsay statements."
[9] Section 90.804(2) contains four hearsay exceptions that apply when the declarant is unavailable as a witness. Under subsection (d), "Statement of personal or family history," the exception applies to:

A statement concerning the declarant's own birth, adoption, marriage, divorce, parentage, ancestry, or other similar fact of personal or family history, including relationships by blood, adoption, or marriage, even though the declarant had no means of acquiring personal knowledge of the matter stated.
[10] In Goodwin v. State, 751 So.2d 537 (Fla. 1999), we held that "use of a harmless error analysis under [State v.] DiGuilio, [491 So.2d 1129 (Fla.1986),] is not necessary where ... the trial court recognized the error, sustained the objection and gave a curative instruction." 751 So.2d at 547. Because the trial court in this case neither sustained Parker's objection in front of the jury nor gave a curative instruction, we conclude that a harmless error analysis is appropriate in this case.
[11] We reject the State's argument that this issue was not preserved on the ground that it is not clear from the record that Parker was asking for a mistrial. After the trial court misstated that Parker was convicted of premeditated murder, defense counsel immediately objected and moved for a mistrial. Defense counsel also clearly stated that the objection still stood after the trial court explained that it would correct the misstatement.
[12] In his tenth issue on appeal, Parker also asserts the murder in the course of a felony aggravator as specified in section 921.141(5)(d), Florida Statutes (2003), is unconstitutional on its face and as applied in this case because it provides for an automatic aggravating circumstance and neither "narrow[s] the class of persons eligible for the death penalty" nor "reasonably justif[ies] the imposition of a more severe sentence on the defendant compared to others found guilty of murder" as required by Zant v. Stephens, 462 U.S. 862, 877, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983). We previously rejected this argument in Blanco v. State, 706 So.2d 7, 11 (Fla.1997). Further, we note that Parker's convictions for both kidnapping and robbery undermine his argument that section 921.141(5)(d) provides for an automatic aggravating circumstance in his case. The trial court relied only on Parker's kidnapping conviction in finding the murder in the course of a felony aggravator, whereas the jury's verdict finding him guilty of first-degree murder is supported, under felony-murder, by robbery in addition to kidnapping.
[13] As part of his challenge to the finding of HAC, Parker also argues that the trial court erred in allowing Nippes to give his opinion on this matter because the testimony about hair structure was outside Nippes' expertise. Parker has failed to show error in the trial court's ruling that Nippes was qualified to testify that the hair found in Bush's car was prematurely removed from Slater's scalp. See Finney v. State, 660 So.2d 674, 682 (Fla. 1995) ("A trial court has broad discretion in determining the range of subjects on which an expert witness can testify, and, absent a clear showing of error, the court's ruling on such matters will be upheld.").